UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-24016-CIV-ALTONAGA/Goodman

LA GORCE PALACE CONDOMINIUM
ASSOCIATION, INC.,

 Plaintiff,
v.

BLACKBOARD SPECIALTY
INSURANCE COMPANY,

 Defendant.
               /

## ORDER

**THIS CAUSE** came before the Court on Plaintiff, La Gorce Palace Condominium Association's *Daubert* Motion to Strike Defense Expert Jake Belleavoine [ECF No. 79], filed on December 16, 2021. Defendant, Blackboard Specialty Insurance Company, filed a Response [ECF No. 85]; and Plaintiff filed a Reply [ECF No. 86]. The Court has considered the parties' written submissions, the record, and applicable law. For the following reasons, the Motion is granted.

### I. BACKGROUND

This is an insurance dispute between a condominium association and its insurance company. Plaintiff is insured through Defendant for the La Gorce Palace Condominium on Miami Beach's Collins Drive. (*See* Notice of Removal, Ex. A, Compl. [ECF No. 1-2] ¶ 4). In September 2017, Hurricane Irma made landfall in South Florida, leaving significant property damage in its wake. (*See id.* ¶ 8). Plaintiff asserts that La Gorce Palace incurred $16,774,538.50 in damages during the storm. (*See* Notice of Removal [ECF No. 1] ¶ 9; Mot. ¶¶ 10–11).

After the storm, Plaintiff filed a claim with Defendant, which commissioned a team from Young & Associates to evaluate the claim. (*See* Mot. ¶¶ 24–26). The team consisted of Neil

Morley, Taylor Morley, Matt Reeser, and Jake Belleavoine. (*See* Mot., Ex. 1, Belleavoine Dep. Tr. [ECF No. 79-1] 99:5–8).[1]

After multiple visits to La Gorce Palace, the Young & Associates team prepared a Xactimate report valuing Plaintiff's claim. (*See* Resp. 2–3). Xactimate is a software that insurance adjusters use to evaluate claims. (*See id.* 6). Users input data about the damaged property, and Xactimate produces an estimate of the repair cost. (*See id.*). The team excluded from its calculations property damage it deemed "clearly identifiable as preexisting[.]" (Belleavoine Dep. Tr. 36:18–20 (alteration added)). If there was "no definitive way to tell" whether damage was preexisting, Young & Associates purportedly "include[d] it" in the report, "giv[ing] the benefit of the doubt to [the] insured." (*Id.* 36:20–22 (alterations added)).

Young & Associates sent Defendant two iterations of the report, one in 2017 and a revised version in 2019. (*See* Def.'s Reply Supp. Mot. Summ. J., Ex. D [ECF No. 38-4] 42–181 (hereinafter "2017 Y&A Report")); Pl.'s *Daubert* Mot. Strike . . . Johan Gouws & Neil Morley, Ex. A, Def.'s Expert Witness Disclosures, Ex. F [ECF No. 40-1] 140–287 (hereinafter "2019 Y&A Report")). Both employ some version of the following equation: Claim Value = Line-Item Subtotal + Overhead and Profits + Taxes + Permit Costs. (*See id.*).

The first version of the report values Plaintiff's claim at $1,130,710.34. (*See* Pl.'s *Daubert* Mot. Strike . . . Johan Gouws & Neil Morley, Ex. A, Def.'s Expert Witness Disclosures, Ex. A, Y&A Final Report [ECF No. 40-1] 128). It is not entirely clear how Young & Associates arrived at this amount. The line-item subtotal for removal and replacement, which is the subtotal ($1,118,407.86), minus tax ($10,070.99) and overhead and profits ($101,675.34), is

---

[1] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. Citations to deposition testimony rely on the pagination and line numbering in the original document.

Case 1:19-cv-24016-CMA   Document 87   Entered on FLSD Docket 02/16/2022   Page 3 of 19

CASE NO. 19-24016-CIV-ALTONAGA/Goodman

$1,006,661.53. (2017 Y&A Report 180). This amount includes the sum of removal and replacement costs for Floors 7-31; the roof; and Floors TS, LPH, and PH; as well as "general conditions" and "labor minimums." (*Id*. 42–180). The line-item subtotal ($1,118,407.86), plus $11,184.08 for permit costs (*see id.* 180), equal $1,129,591.94, which, curiously, are $1,118.40 shy of the $1,130,710.34 total estimated in the first report. (*See* Y&A Final Report 128). Young & Associates does not specify where it found the additional $1,118.40.

The "revised" report values Plaintiff's claims at $1,239,169.66, an increase of over $100,000 from the initial report. (*Id*.). It contains all the items present in the first iteration of the report, and it attributes the same values to those items. (*Compare* 2017 Y&A Report 44–180, *with* 2019 Y&A Report 143–280). The increase comes from the added cost of repairing the "Exterior" curtain wall (*id*. 279–80), which does not appear in the first iteration. While this increase appears straightforward, it contains one inconsistency that creates ambiguity about the revised report's total estimation. The revised version provides two different estimations for overhead and profits.

In its "Line Item Totals[,]" the revised report values overhead and profits at $111,428.00. (*Id*. 280 (alteration added)). The "Summary" page, however, values overhead and profits at $112,653.68. (*See id*. 281). The report does not explain why there are two overhead and profits amounts, but the disparity obviously impacts the total value of the claim. The line-item subtotal is $1,102,246.45. (*See id*.). The tax amounts to $12,012.66, and permits are $12,256.87. (*See id*.). Thus, if the initial overhead and profits estimate applies, the total claim is valued at $1,237.943.98. The latter estimate pushes the total to $1,239,169.66. (*See id*.).

Regardless of which overhead and profits estimate applies, both reports contradict Plaintiff's estimation of $16,774,538.50. Defendant, relying in part on Young & Associates' work, determined the property had only incurred storm-related damages of $1,333,394.66. (*See* Resp.

3

2). This fell short of the policy's $1,525,263.64 hurricane deductible, the threshold necessary for Plaintiff to recover anything. (*See id*.). In other words, Defendant countered that Plaintiff was entitled to nothing. Plaintiff sued.

On May 20, 2020, Defendant disclosed Johan Gouws, an architect, and Neil Morley as its expert witnesses. (*See* Pl.'s *Daubert* Mot. Strike . . . Johan Gouws & Neil Morley, Ex. A, Def.'s Expert Witness Disclosures [ECF No. 40-1] 1–2). Mr. Morley is Senior Regional Consultant at Young & Associates and was part of the four-person team commissioned to investigate the damage site. (*See* Y&A Final Report 128). Intending to provide expert testimony on the cost of repairing the damage incurred during Irma (*see* Def.'s Expert Witness Disclosures 2), Mr. Morley submitted a report, was deposed, and prepared to give expert testimony at trial. (*See id*.; Pl.'s *Daubert* Mot. Strike . . . Johan Gouws & Neil Morley, Ex. D, Morley Dep. Tr. [ECF No. 40-4]).

Mr. Morley's conclusions relied heavily on the Xactimate report that his Young & Associates team put together after investigating La Gorce Palace. (*See* Pl.'s Mot. to Strike Def. Experts Johan Gouws and Neil Morley [ECF No. 40] 3). One problem: Mr. Morley had almost no role in preparing the Xactimate report.

While Mr. Morley did visit the site during the investigation, it was another member of his team, Jake Belleavoine, who prepared the report. (*See* Mot. ¶¶ 3–4). Mr. Belleavoine took notes alongside Mr. Morley (*see* Belleavoine Dep. Tr. 99:5–6), came up with input values, and had Xactimate crunch the numbers (*see id*. 99:11–12). The only thing for Mr. Morley to do was read the report and relay its conclusions. (*See* Mot. ¶ 1).

But mere recitation of the major points from Mr. Belleavoine's report, without knowledge of how Mr. Belleavoine put the report together in the first instance, would not pass as expert testimony. *See United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) ("An expert who

4

parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy."). Thus, when Plaintiff filed its *Daubert* Motion to Strike Defense Experts Johan Gouws and Neil Morley, the Court granted the Motion with respect to Mr. Morley. (*See* Oct. 9, 2020 Order [ECF No. 58] 1).

Defendant sought to fix the problem by adding Mr. Belleavoine as a witness. (*See* Mot. ¶¶ 3–4). Mr. Belleavoine, formerly a construction consultant for Young & Associates, operates his own consulting company, Bell Consulting. (*See* Belleavoine Dep. Tr. 13:19–22; 57:6–24). He worked for Young & Associates as an independent contractor from 2011 to 2018. (*See id*. 11:5–7, 57:25–58:6). Most significantly, he worked under Mr. Morley on the La Gorce Palace investigation (*see id*. 23:4–8) and prepared the initial Xactimate report (*see id*. 99:11–13). Because he stopped taking work from Young & Associates in 2018 (*see id*. 57:25–58:6), Mr. Belleavoine did not work on the revised 2019 report (*see id*. 58:7–11).

Plaintiff filed a Cross-Motion for Leave to Disclose Expert [ECF No. 62], which the Court granted. (*See* Nov. 23, 2020 Order [ECF No. 73] 1–2). Plaintiff has since deposed Mr. Belleavoine (*see generally* Belleavoine Dep. Tr.), who is poised to give testify at trial regarding his preparation of the Xactimate report. But — and not surprisingly — Plaintiff has filed another Motion to Strike, this time targeting Mr. Belleavoine. (*See* Mot.).

Plaintiff requests the Court prevent Mr. Belleavoine from testifying at trial and exclude his report and deposition testimony from the evidentiary record. (*See id*. 1). Plaintiff's Motion advances two primary arguments. First, Plaintiff argues that while Mr. Belleavoine prepared the initial report, he had no role in preparing a second, "revised" report. (*Id*. ¶¶ 15–16 (quotation marks omitted)). Therefore, Plaintiff asserts he should not be allowed to testify about the revised

version. (*See id.* ¶ 17). Second, Plaintiff argues Mr. Belleavoine falls short of the *Daubert*[2] standard because (1) he lacks the requisite qualifications, (2) employed unreliable methods in preparing his report, (3) would not assist the jury, and (4) Defendant's disclosure of Mr. Belleavoine was untimely.[3] (*See id.* 6, 8, 15).

## II. STANDARDS

Rule 702, which governs expert testimony, states as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This "'gatekeeping'" function must be performed with regard to the admissibility of both expert scientific evidence and expert technical evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589 n.7, 597; citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the

---

[2] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

[3] Because the Court finds Plaintiff's second argument meritorious, it does not address the third and fourth arguments.

standards for admissibility under Rule 702." *Id.* (emphasis, alteration, citation, and quotation marks omitted).

The Eleventh Circuit requires district courts to conduct a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert [must be] qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions [must be] sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony [must] assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (alterations added; citation omitted).[4] The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, the testimony satisfies each prong. *See id.* (citation omitted).

Federal Rule of Evidence 703 also applies here. Rule 703 governs the permissible bases for an expert's opinion testimony and provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Rule 703 permits expert testimony "based on firsthand observation of the witness, on facts or data presented at the trial, or on facts and data presented before the trial[.]" *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (alteration added). It does *not* permit an expert to "simply repeat or adopt the findings of another expert without attempting to assess the validity

---

[4] Part two of the Eleventh Circuit's admissibility inquiry — the reliability analysis — can be read to encompass sub-sections (b), (c), and (d) of Rule 702.

of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (citations omitted). Courts thus need to "ensure that an expert witness is sufficiently familiar with the reasoning or methodology" underlying the expert's testimony. *Id.* (citation omitted).

### III. DISCUSSION

#### A. Rule 703

As a threshold issue, Plaintiff asks the Court to strike Mr. Belleavoine as an expert because he played no role in the 2019 revisions to his initial Xactimate report. Plaintiff reasons that if Mr. Morley cannot testify as an expert because he would merely be reading a report that someone else prepared, Mr. Belleavoine should not be allowed to give expert testimony on a version of a report he did not prepare. (*See* Mot. ¶¶ 15–17).

During his deposition, Mr. Belleavoine admitted that he did not prepare the revised version of the report, nor does he know who did. (*See* Belleavoine Dep. Tr. 27:10–28:9). He did not consider any repairs to the curtain wall, which is the primary distinguishing characteristic between the two reports. (*See id.* 50:4–11). He did no work whatsoever on the Xactimate report after 2017 (*see id.* 27:10–28:9), and his work with Young & Associates ended in 2018 (*see id.* 57:25–58:6).

Plaintiff's argument is not unfounded. Certainly, Mr. Belleavoine may not, "under the guise of giving expert testimony . . . [,] become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (alterations added; citation and quotation marks omitted). It would not cure the problems associated with Mr. Morley's expert testimony to simply replace one parrot with another, especially if Mr. Belleavoine displayed a similar lack of familiarity with the report. He would not be "sufficiently familiar with the reasoning or methodology behind the

information to permit cross-examination." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d at 1357 (citation omitted). Rather, he would merely be repeating the revisions some unnamed Young & Associates investigator fed into Xactimate.

That said, Mr. Belleavoine's level of involvement with the underlying report is far greater than Mr. Morley's, so the situations are not perfectly analogous. Mr. Belleavoine may not have contributed to any revisions after submitting his initial report, but the two versions have much in common. Line by line, the first 138 pages of the two reports contain the *exact same values*. (*Compare* 2017 Y&A Report 44–180, *with* 2019 Y&A Report 143–280). It is only near the end of the revised report, which features an "Exterior" section estimating the cost of repairing the curtain wall, that the two diverge. (2019 Y&A Report 279–80).

The Court would not completely bar Mr. Belleavoine from testifying about a report that is substantially his own work merely because of some subsequent revisions. The bulk of the report is Mr. Belleavoine's own creation, based on his investigation of La Gorce Palace in the aftermath of the storm. Rule 703 permits "expert testimony . . . based on firsthand observation of the witness[.]" *Tyler*, 958 F.2d at 1188 (alterations added). Thus, under Rule 703, Mr. Belleavoine may testify to the first 138 pages of the revised report, which he purportedly prepared. (*See* 2019 Y&A Report 141–279).

At the same time, Plaintiff's argument succeeds as to the 2019 revisions. At his deposition, Mr. Belleavoine acknowledged his ignorance regarding the curtain wall repair estimations. (*See* Belleavoine Dep. Tr. 27:10–28:9, 50:4–11). He did not collect any information relevant to the curtain wall, nor does he know how Young & Associates came to its estimation. (*See id.*).

If Mr. Belleavoine were to testify about the 2019 revisions, he would be no different than Mr. Morley: a mere "mouthpiece" for someone else's out of court statements. *Factory Mut. Ins.*

9

*Co.*, 705 F.3d at 524 (citation and quotation marks omitted). Such testimony is not admissible under Rule 703. *See Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . . , such expert must make some findings and not merely regurgitate another expert's opinion." (alteration added; citations and quotation marks omitted)). Further, he would be unable to testify to the discrepancy between the reports' two overhead and profit estimations. Thus, Plaintiff's arguments under Rule 703 succeed, but only as to the revisions that distinguish the 2019 report from the original 2017 report. Plaintiff's Motion would thus be due to be granted with respect to the material included in the revised report.

### B. Rule 702

As to the rest of Mr. Belleavoine's testimony, Plaintiff's second argument rests on traditional *Daubert* grounds. The parties agree that the three-part inquiry articulated in *Hendrix ex rel. G.P.* applies. *See Hendrix ex rel. G.P.*, 609 F.3d at 1194 (requiring that experts (1) be qualified to testify competently regarding the matters they intends to address; (2) their methodology be sufficiently reliable; and (3) their testimony assist the trier of fact (citation omitted)).

#### 1. Qualifications

Expert testimony is admissible only if the testimony is given by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702 (alterations added). The plain language of Rule 702 makes clear, "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61 (alteration added). Assuming an expert is qualified to testify, the expert may testify only about matters within the scope of the person's expertise. *See*

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (explaining "the expert [must be] qualified to testify competently regarding the matters he intends to address" (alteration added; citations and footnote call number omitted)); *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) ("Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." (quotation marks and citation omitted)).

Defendant intends to have Mr. Belleavoine opine on the cost of repairing La Gorce Palace's storm-related damages. (*See* Resp. 4–5). It holds up Mr. Belleavoine as "a construction consultant with over thirteen (13) years of experience in construction cost estimating and claim logistics, including work on various property loss claims for condominium complexes, like the Plaintiff's Property." (*Id*. 3). Plaintiff argues that this tells an incomplete story.

First, Mr. Belleavoine's formal credentials are wanting. He has no independent adjuster's license, public adjuster's license, or general contractor license. (*See* Belleavoine Dep. Tr. 15:13–16:3). He does not have a degree from any college, university, or trade school. (*See id*. 8:20–23, 15:9–15:12).

Mr. Belleavoine's only certifications are a Water Damage Restoration certificate from the Institute of Inspection Cleaning and Restoration Certification ("IICRC") and a certificate of proficiency for Xactimate. (*See id.* 13:2–3, 14:18–15:13). He testified that the former "just shows you're proficient in understanding the IICRCs500 water restoration outline." (*Id*. 16:13–15). The latter merely concerns the software that processes values about damaged buildings; it does not inform the process by which the adjuster or consultant examines the damaged building and determines input values. (*See id*. 77:24–78:10).

11

Plainly, Mr. Belleavoine lacks basic certifications associated with evaluating insurance claims. This cuts against Defendant's argument that he is a qualified damages expert. *See Bruce v. Minn. Life Ins. Co.*, No. 20-cv-44-S, 2021 U.S. Dist. LEXIS 219374, at *7–8 (D. Wyo. Aug. 16, 2021) (excluding a damages expert who was "not licensed and never ha[d] been licensed as an insurance adjuster or attorney" in the forum state (alteration added)); *Am. Cas. Co. v. Reynolds Concrete Pumping, LLC*, No. 5:19-cv-488-DCR, 2021 WL 2936130, at *2 (E.D. Ky. July 13, 2021) (excluding a damages expert who "held no professional licenses or certifications").

Nonetheless, as Defendant stresses, formal credentials alone are not necessarily determinative. (*See* Resp. 5–6). Experience may provide a sufficient foundation for expert testimony. *See Frazier*, 387 F.3d at 1261 (citation omitted). Even where an expert's experience is "scant and dated[,]" it may suffice to deem the witness "minimally qualified[.]" *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009) (alterations added; citation omitted).

Mr. Belleavoine possesses relevant experience, albeit somewhat attenuated. Admittedly, he has never testified as an expert in any court case. (*See* Belleavoine Dep. Tr. 25:12–15). He has never provided estimates for any high-rise buildings or condominiums in Miami-Dade County. (*See id*. 48:21–49:20). He has never provided estimates for buildings as tall as La Gorce Palace, which stretches 34 stories high. (*See id*.). He has provided estimates for "seven" buildings over 20 stories, as well as "dozens" of smaller buildings impacted by storms. (*Id*. 49:1–5).

Mr. Belleavoine's experience providing estimations for taller buildings, as well as buildings damaged in storms, indicates that he is "minimally qualified in his field[.]" *Hendrix*, 255 F.R.D. at 578 (alteration added; citation omitted). The qualification standard is "not stringent[,]" and the expert "need not be a leading authority in the field." *Id*. (alteration added; citations omitted). Thus, while Plaintiff is correct that Mr. Belleavoine's experience does not

12

perfectly suit this case, precedent cautions against striking an expert witness on the qualification prong alone, however attenuated that expert's background may seem. *See Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." (alteration added; other alteration adopted; citation omitted)); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) ("An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand." (citation omitted)).

### 2. Reliability

Of course, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261. Under Rule 702, expert testimony is admissible only if "the testimony is based on sufficient facts or data; . . . the testimony is the product of reliable principles and methods; and . . . the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d) (alterations added). Accordingly, a witness "relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Frazier*, 387 F.3d at 1261 (alteration added; quotation marks, emphasis, and citations omitted).

In *Kumho Tire*, the Supreme Court emphasized "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." 526 U.S. at 152. While the inquiry is "a flexible one," the focus "must be

13

solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95 (footnote call number omitted). "But conclusions and methodology are not entirely distinct from one another . . . [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (alterations added). It may exclude expert testimony where "there is simply too great an analytical gap between the data and the opinion proffered[,]" or where the testimony's "factual basis is not adequately explained" in the first instance. *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (alteration added; citations omitted).

Mr. Belleavoine's investigation of La Gorce Palace took just two days. (*See* Belleavoine Dep. Tr. 26:3–10). In that time, he determined the cost of repair for 208 units and 6 common spaces, spread across 34 stories. (*See* Mot. ¶ 9). Plaintiff questions how he could have completed such a large investigation quickly while employing a reliable methodology. (*See id.* ¶¶ 34–6).

Defendant lacks a good answer. During his deposition, Mr. Belleavoine admitted there are no field notes documenting the measurements necessary to estimate the cost of repairs in each unit. (*See* Belleavoine Dep. Tr. 104:25–110:8). He also admitted that he did not inspect each room himself (*see id.* 34:23–25), nor did he know who inspected which room (*see id.* 38:20–39:11). These information gaps render it difficult to connect how Mr. Belleavoine's investigation yielded the damage estimations proffered in his report.

More troubling, however, is that Plaintiff has no way to evaluate Mr. Belleavoine's process of deciding which damages were "preexisting." Mr. Belleavoine testified that if there was "no definitive way to tell" whether a particular set of damages preexisted Irma, he "include[d] it[,] giv[ing] the benefit of the doubt to [the] insured." (*Id*. 36:20–22 (alterations added)). But where

14

property damage was "clearly identifiable as preexisting[,]" the report excluded it from consideration. (*Id*. 36:18–19 (alteration added)). Yet, what does it mean to be "clearly identifiable as preexisting," and what damages did Mr. Belleavoine exclude from the report?

The answers to these questions are fatally unclear. Mr. Belleavoine made no log of which damaged rooms, appliances, ceilings, or walls he deemed "preexisting." (*Id*. 38:5–39:13). His report does not detail any intelligible process for distinguishing preexisting damages from Irma-related damages. During his deposition, he failed to explain a methodology, merely positing that it would be "easiest" to compare documents from before the storm with photos taken thereafter. (*Id*. 37:23–38:23). Assuming this is what Mr. Belleavoine did here (and it is not clear whether the Young & Associates team applied this approach), the answer says nothing about how one actually makes the determination after examining the documents and the photographs.

To make matters worse, even if Mr. Belleavoine's process were spelled out more clearly, it would suffer from the greater flaw of being untestable. Which units and appliances did Mr. Belleavoine exclude from the damages total under the guise of being "clearly identifiable as preexisting"? And which documents did Mr. Belleavoine rely on in making those decisions? Nobody knows. Mr. Belleavoine did not keep such a chart, nor can he even say whether one exists. (*See id*. 38:5–39:11). And he did not investigate each room himself (*see id*. 39:5–11), so his testimony would be even less helpful regarding the rooms he did not investigate.

In short, Mr. Belleavoine has been unable to clarify which damages he excluded as preexisting, the process for distinguishing preexisting damages from storm-related damages, or who screened which room for preexisting damages. (*See id*. 36:8–39:11). And as to the damages logged in the report, Mr. Belleavoine has not been able to provide any measurements associated

15

with estimated costs of repairing each unit.[5] (*See id*. 104:25–110:8). These factual and analytic gaps render it nearly impossible to test the values eventually input to Xactimate. Mr. Belleavoine's analysis thus "suffers from the impermissible 'black box' syndrome, where 'data is fed at one end and an answer emerges at the other, and the jury cannot see how the pieces fit together or how the data drives the conclusion.'" *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 377 (N.D. Fla. 2017) (alteration adopted; citation omitted).

Defendant mounts two counterarguments. First, it stresses that Xactimate, the software Mr. Belleavoine used to generate his estimates, is an accepted method of damage estimation that regularly survives *Daubert* review. *See, e.g.*, *Bodo v. GeoVera Specialty Ins. Co.*, No. 8:18-cv-678, 2019 WL 9598314, at *4 (M.D. Fla. Mar. 8, 2019) ("[C]ourts have concluded that Xactimate satisfies the Daubert requirement that the proposed expert utilize a sound methodology. . . . It is a standard tool for estimating damages in the insurance industry." (alterations added)). According to Defendant, Mr. Belleavoine used Xactimate to prepare his damages report, thereby satisfying the reliability prong of the *Daubert* inquiry. (*See* Resp. 13–14).

This argument misses the point. Plaintiff's Motion does not attack Xactimate as a reliable means of processing data. Instead, Plaintiff disputes the process by which Young & Associates gathered data *prior* to running the data through Xactimate. The methodological deficiencies in Mr. Belleavoine's investigation render the Xactimate *input* values unreliable. (*See* Reply ¶¶ 16–19). Unreliable inputs yield unreliable outputs. *See Coffey v. Dowley Mfg., Inc.*, 89 F. App'x 927, 931 (6th Cir. 2003) (excluding as unreliable expert testimony where the witness "made

---

[5] Mr. Belleavoine insists that measurements *do* exist for some units (*see id*. 109:20–110:2), but at his deposition, he admitted he did not have measurements for at least four units that Plaintiff's counsel inquired about (*see id*. 108:25–109:11). Further, if there *are* measurements for any other units or common rooms, Mr. Belleavoine neither included them in his report nor explained why he kept measurements for some units and not for others.

'guesstimations' with regard to important elements of [his] calculations" (alteration added)); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 281 n.21 (D. Conn. 2017) ("[N]o matter how sophisticated and capable an information processor is, the quality of that information it generates cannot be superior to the quality of the information it received." (alteration added; quotation marks omitted)); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 143 (M.D. Pa. 2015) (acknowledging that discounted cash flow models are "commonplace" but nevertheless excluding expert testimony because the expert "input[] inflated projections into a discounted cash flow model[,]" rendering the calculations "unreliable" (alterations added)); *Kay v. First Cont'l Trading*, 976 F. Supp. 772, 775–76 (N.D. Ill. 1997) (excluding an expert's otherwise "permissible" statistical model because the expert used "speculative" input values).

Xactimate may be a reliable processor, but that does not cure Mr. Belleavoine's earlier methodological missteps. *Daubert* requires "conclusions supported by good grounds for each step in the analysis — mean[ing] that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible*." McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (alteration added; emphasis in original; quotation marks and citations omitted).

Second, Defendant argues that Plaintiff's concerns go to the *weight* of Mr. Belleavoine's testimony, rather than its admissibility. (*See* Resp. 10). This was certainly true with respect to *Daubert's* qualifications prong. The Court agreed that Mr. Belleavoine is minimally qualified to testify, and to the extent Plaintiff sought to attack his qualifications, such attack was best reserved for cross-examination. Not so for the reliability prong, however.

The second *Daubert* prong "is not a mechanism for grading expert reports[.]" *Lee-Bolton*, 319 F.R.D. at 378 (alteration added; quotation marks and citation omitted). Nonetheless, "the

17

expert's opinion must be supported by the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (quotation marks omitted; quoting *Kumho Tire Co.*, 526 U.S. at 152).

Mr. Belleavoine fell short here. He did not explain an intelligible process for identifying which damages he deemed "clearly identifiable as preexisting[,]" nor could he even identify the damages he excluded on this basis. (Belleavoine Dep. Tr. 36:18–39:11 (alteration added)). Defendant may not pass off as reliable methodology a judgment call informed only by Mr. Belleavoine's purported "experience — an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross examination[.]" *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (alteration added; citation and quotation marks omitted). Rule 702 does not permit such conjecture. *See GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) ("[T]he Court must be able to see the mechanisms in order to determine if they are reliable and helpful." (alteration added; quotation marks and citation omitted)); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion[.]" (alteration added; citations omitted)). Thus, the Motion must be granted, striking Mr. Belleavoine as a proposed expert.

Defendant's failure to establish the second prong obviates the need to proceed to the third. *See Hendrix ex rel. G.P.*, 609 F.3d at 1194 ("The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies *each prong*." (emphasis added; citation omitted)). Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiff's *Daubert* Motion to Strike Defense Expert Jake Belleavoine **[ECF No. 79]** is **GRANTED**.

CASE NO. 19-24016-CIV-ALTONAGA/Goodman

**DONE AND ORDERED** in Miami, Florida, this 16th day of February, 2022.

*[Signature]*

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc: counsel of record